| | |
|---|---|
| JOSE CORTEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:16-CV-1397- GCS |
| | ) |
| DR. SOLOMON APOSTOL, | ) |
| JEANNE CAMPANELLA, | ) |
| and PENNY GEORGE | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM and ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Pending before the Court are Defendants' motions for summary judgment (Doc. 69, 73). Plaintiff Jose Cortez opposes the motions (Doc. 79, 81). Based on the following, the Court grants the motions for summary judgment.

Cortez, a former inmate incarcerated at Vienna Correctional Center ("Vienna"), brought this lawsuit alleging violations of his civil rights on December 29, 2016 (Doc. 1).[1] Cortez alleges that Defendants Dr. Solomon Apostol, Jeanne Campanella and Penny George failed to provide adequate medical care in violation of the Eighth Amendment. Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Cortez was permitted to proceed on the following claims: (1) that Defendants Dr. Apostol and

---

[1] The record reflects that Cortez is now incarcerated at Robinson Correctional Center (Doc. 97).

Warden Campanella violated Cortez's Eighth Amendment rights when they denied him low bunk, low gallery permits; and (2) that Defendants George and Dr. Apostol violated Cortez's rights when they denied him surgery that a prior medical provider found necessary. (Doc. 8).

Defendants moved for summary judgment arguing that they were not deliberately indifferent to Cortez's medical needs. Cortez opposes the motion. As the motion is ripe, the Court turns to address the merits of the motions.

**FACTS**

The following facts are taken from the record and presented in the light most favorable to Cortez, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

At the time of the events alleged in the complaint, Campanella was the Warden at Vienna, George was Health Care Unit Administrator at Vienna and Dr. Apostol was a physician at Vienna.

On November 19, 2014, Cortez fell 25 feet from a bridge. After the fall, Cortez was transferred to John Stroger Hospital near Chicago where he was treated by Orthopedic surgeon, Dr. Rajeev Garapati. Cortez underwent three surgeries, wherein plates and pins were used to treat his injuries in both legs and feet. Cortez's diagnosis was B/I Calcaneus fracture and left knee fracture. When Cortez was discharged from the hospital, he received an "Ambulatory Community Health Network and Bureau Return to Work/School Verification" from Cook County Health and Hospital Systems dated April 30, 2015. (Doc. 70-3). This form states: "Patient is currently full weight bearing as

tolerated. Currently patient needs ambulatory assistance such as a walker/cane. Please provide ambulatory assistance at institution. Patient have [sic] an appoint for 5/14/15 and will be reassessed." *Id*.

Several months after the fall, Cortez was incarcerated within the Illinois Department of Corrections ("IDOC"). While housed at Stateville Correctional Center ("Stateville"), Cortez had a low bunk permit. On December 1, 2015, Cortez transferred from Stateville to Vienna. At this time, Cortez had a walker to assist him.

Thereafter, on December 9, 2015, Cortez went to the Health Care Unit ("HCU") with complaints of constant pain at the left knee and lower leg. During this visit, the nurse noted that Cortez used a walker and that he requested an ACE wrap and splint. The nurse referred him to the doctor, gave him acetaminophen for the pain and told him to return if the symptoms worsened or interfered with daily functioning. (Doc. 70-4, p. 2).

Nine days later on December 18, 2015, Cortez returned to the HCU as part of sick call and saw Dr. Apostol. Dr. Apostol noted that Cortez requested an ACE wrap and splint boots for his legs and feet and that Cortez "has persistent pains in the . . . left foot when walking because of metal plates in the legs." Dr. Apostol examined Cortez and identified Cortez's surgical scars on the antero-lateral aspect and medial aspect of the left leg as well as the right posterior heel. Dr. Apostol ordered ankle foot orthotic ("AFO") splints for both legs. Cortez told Apostol he received the ACE wraps (Doc. 70-4, p. 3).

On December 23, 2015, Cortez returned to the HCU as part of sick call and the complaint stated: "Req. low bunk." Cortez also told Dr. Apostol that he was "[s]till waiting for his AFO splint and men's shoe; says his left knee 'locks up' when he stands

from a sitting position and would like to request a knee sleeve to stabilize his left knee when trying to get up." Dr. Apostol ordered Cortez a left knee sleeve. (Doc. 70-4, p. 4).

Cortez returned to the HCU on February 17, 2016 complaining of the November 2014 fall from a bridge and requesting to see a physician about a future surgery. During this visit, the nurse examined Cortez, prescribed him pain medication and referred him to the doctor for a follow-up appointment. (Doc. 70-4, p. 5).

Six days later, Cortez filled out an "Offender Request" to Health Care stating: "I am handy cap [sic] Need to see Dr. Apostol or any Dr. to speak about lower bunk permit urgent." (Doc. 70-7).

On February 25, 2016, Cortez returned to the HCU for sick call requesting a tibia x-ray and a low bunk. Dr. Apostol ordered that an x-ray of Cortez's left leg be performed and requested Cortez's medical records from John Stroger Hospital in Chicago. (Doc. 70-7, p. 6). Also, during this examination, Dr. Apostol informed Cortez that he did not meet any of the five factors for a lower bunk at Vienna. The five factors included: (1) 60 years old or older; (2) 300 pounds or heavier; (3) history of seizures; (4) history of strokes or (5) history of artificial limbs. Dr. Apostol additionally informed Cortez that he would have to put in a request to correctional officers or administrative staff at Vienna to request a lower bunk. (Doc. 70-6; Doc. 70-2, p. 40-44).

On March 1, 2016, Cortez signed a medical release authorization for his records at John Stroger Hospital and those medical records were received on March 2, 2016. (Doc. 70-4, p. 33). The left leg x-ray ordered by Dr. Apostol was performed on March 3, 2016. *Id.* at p. 7-9, 30. The x-ray was reviewed by radiologist, Dr. Malpani at One Radiology on

March 4, 2016. Dr. Malpani found as follows: "[t]here has been prior open reduction and internal fixation of proximal fibular fractures. No acute bony injury is identified. Degenerative change is seen in the left knee. Note is also made of prior fixation of calcaneal fracture. Bones are somewhat demineralized." *Id*. at p. 30. The record reveals that Dr. Apostol reviewed the x-ray report on March 8, 2016. *Id.*

Cortez claims he sent George a letter dated March 4, 2016 in the institutional mail, and he never received a response. On March 10, 2016, Cortez filed an emergency grievance complaining about Dr. Apostol denying him a low bunk permit and a slow walk permit. On March 11, 2016, Campanella denied Cortez's grievance as an emergency and copied the health care unit on her response. That same night, Cortez claims that he fell while climbing down from the top bunk and that there were no ladder or rails to assist him. A few days later, Cortez discussed with Campanella and the prison chief of security the denial of his low bunk permits. The next day, on March 15, 2016, Cortez received a low bunk and low housing permit.

On March 28, 2016, Dr. Apostol saw Cortez for a follow up visit from a March 25, 2016 visit to the HCU in which the nurse referred him to the doctor for a fall. During this visit, Cortez told Dr. Apostol that he fell off the top bunk while getting out of bed on March 12, 2016, and that his right foot hurt from this fall. Dr. Apostol examined Cortez, noted swelling in his right foot and ankle and prescribed Naproxen for one month to be taken as needed. Dr. Apostol diagnosed Cortez with a right foot sprain and ordered an x-ray to determine whether there was a fracture. (Doc. 70-4, p. 11). The x-ray was performed on March 31, 2016. Dr. Vyas at One Radiology reviewed the x-rays on April 1,

2016. Dr Vyas found the following: "[t]here is diffuse bony demineralization. ORIF of the calcaneus is demonstrated with plate and screw fixation. There is no acute displaced fracture. No dislocation." Dr. Apostol reviewed the x-ray report on April 5, 2016. *Id.* at p. 32.

Thereafter, Cortez went to the HCU on April 11, 2016 for a follow up for the right foot x-rays. Dr. Apostol informed Cortez that the x-rays did not show any new fracture or dislocation in his right foot. (Doc. 70-4, p. 14).

On May 12, 2106, a nurse noted that Cortez came to the HCU with a report that his orthopedic surgeon told him that a plate/plates at the site of his previous tibia/fibula fracture may need to be removed and that he wanted to see a doctor. (Doc. 70-4, p. 18).

Again, on May 24, 2016, Cortez presented to the HCU requesting that the hardware be removed. The nurse referred him to the doctor to discuss hardware removal and the possibility of discontinuing the use of the walker. (Doc. 70-4, p. 20). On May 26, 2016, Cortez was seen in the HCU by Dr. R. Matticks. During this visit, Dr. Matticks discussed with Cortez the pros and cons of hardware removal and told Cortez he wanted to review Cortez's previous x-rays before considering whether to send Cortez to an orthopedic. (Doc. 70-4, p. 21).

On June 9, 2016, Dr. Yousuf at One Radiology reviewed a March 3, 2016 x-ray. Dr. Yousuf's report found that Cortez's hardware associated with the open reduction internal fixation was intact. (Doc. 70-4, p. 31). Dr. Matticks received and reviewed Dr. Yousuf's x-ray report on June 11, 2016. *Id.*

On August 1, 2016, Cortez requested that Dr. Apostol look into taking out the hardware in his left leg. Dr. Apostol prescribed Cortez with Ibuprofen and Robaxin. (Doc. 70-4, p. 24). Following this visit, Dr. Apostol reviewed Dr. Yousuf's June 9, 2016 report which stated the hardware was intact. (Doc. 70-4, p. 31). On August 16, 2016, Cortez returned to the HCU for an evaluation of his lower extremity and for the removal of the hardware in his legs. During this visit, Dr. Apostol informed Cortez that the hardware did not need to be removed. (Doc. 70-4, p. 25).

On May 31, 2018, Cortez returned to see his orthopedic surgeon, Dr. Garapati (Doc. 70-11). Dr. Garapati issued the following plan:

> I had a lengthy discussion with the patient today, told him he does not need to have his hardware out. He wishes just leave it at this point in time. He understands that he has arthritis and these areas are never going to be normal. He at this point will follow up with us on a p.r.n. basis. I told him he is always going to have limited standing and walking ability but can do desk work only and that this limited standing and walking is going to be a permanent disability for the patient. All of his questions were answered today. He will follow up with us on a p.r.n. basis. He understands that he may end up needing hardware removal, possible subtalar fusions as well as possible left knee replacement in the future.

*Id*. at p. 2

Prior to December 2015, inmates arriving at Vienna had to be seen by medical staff to determine if a low bunk permit should continue. After 2016, a low bunk permit issued at another facility would automatically apply upon an inmate's transfer to another prison.

## ANALYSIS

Summary judgment is proper only if the moving party can demonstrate there is no genuine issue as to any material fact, and the movant is entitled to judgment as a

matter of law. *See* FED. R. CIV. PROC. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Any doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof." *Celotex*, 477 U.S. at 323. A party asserting that a fact is genuinely disputed must support that assertion by citing to particular materials in the record or by showing that the materials in the record do not establish the absence of a genuine dispute. *See* FED. R. CIV. PROC. 56. If the non-moving party does not show evidence exists that would reasonably allow a fact-finder to decide in its favor on a material issue, the court must enter summary judgment against the non-moving party. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

The Seventh Circuit has stated summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)(quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which

every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-592. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

To show prison officials acted with deliberate indifference, a plaintiff must put forth evidence that prison officials not only knew that the prisoner's medical condition posed a serious health risk, but that they also consciously disregarded that risk. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id. Accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(stating that "[d]eliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)(stating that "negligence, even gross negligence does not violate the Constitution.").

For a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008)(quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)(citation omitted).

"But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). The Eighth Amendment does not require that prisoners receive "unqualified access to health care[.]" Rather, they are entitled only to "adequate medical care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

### A.  Dr. Solomon Apostol

Construing the evidence in the light most favorable to Cortez, the Court finds that he has not established that Dr. Apostol was deliberately indifferent to his medical needs regarding his legs or by denying him the low bunk, low gallery permits. The record reveals that Apostol from late 2015 to 2016 provided appropriate medical treatment to Cortez. Dr. Apostol routinely saw, examined, treated, and prescribed orders and medications. From December 2015 to August 2016, The medical treatment simply was not the treatment Cortez wanted or demanded. Cortez received the following treatment regarding his legs:

- Cortez was provided a plan and orders to receive ankle foot orthotic splints for both legs;
- Cortez received the ACE wraps he requested;
- Cortez received a left knee sleeve he requested;
- Cortez was ordered and received radiological imaging;

- Dr. Apostol reviewed the radiological reports;

- Dr. Apostol reviewed the notations of an examination of Dr. Matticks in the Health Care Unit;

- Dr. Apostol requested and reviewed Cortez's medical records from John Stroger Hospital;

- Dr. Apostol consulted with an orthopedic surgeon colleague about Cortez.

The record demonstrates that Dr. Apostol, after examining Cortez numerous times and reviewing his medical records, determined that hardware removal was not necessary.

As to the low bunk permit, Dr. Apostol, after examining Cortez, found that it was not medically necessary for Cortez to have a low bunk permit as Cortez did not meet any of the five criteria and informed Cortez of the specific five factors necessitating a low bunk permit.[2] Dr. Apostol instructed Cortez that he needed to put in a written request for the low bunk permit to IDOC administration. Lastly, the record reflects that Dr. Apostol's last treated Cortez on August 16, 2016.[3]

Clearly the record does not contain evidence that Cortez's treatment for his legs and the low bunk permit was so inappropriate or that Cortez's treatment was a substantial departure from accepted professional judgment, practice or standards. Even construing the facts in the light most favorable to Cortez, the medical records at the time

---

[2] Under the guidelines at Vienna, the five factors are: (1) 60 years of age or older; (2) weighing 300 pounds or heavier; (3) history of seizures; (4) history of strokes; or (5) artificial limbs.

[3] Thus, Cortez's inclusion of an October 13, 2017 record that states Cortez is unable to climb stairs is not helpful to the analysis of the issues before the Court as it does not shed any light on whether Cortez could climb stairs *at the time* Dr. Apostol was treating him.

do not support Cortez's subjective complaints. Likewise, the record does not support that Cortez's hardware needed to be removed. In fact, on May 31, 2018, Cortez's surgeon, Dr. Garapati, determined that Cortez "does not need to have the hardware out." (Doc. 70-6). Cortez even acknowledged this finding during his deposition. (Doc. 70-1, p. 147). Simply put, there is no evidence that Dr. Apostol was deliberately indifferent to Cortez's medical needs.

**B.     Jeanne Campanella and Penny George**

Prison officials, who are non-medical professionals, are entitled to rely upon the judgment of medical professionals to avoid liability under the Eighth Amendment. *See Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008). For example, the Seventh Circuit found that "as a layperson, the warden could rely on the medical staff's expertise as long as he did not ignore [an inmate] or his mistreatment." *Diggs v. Ghosh, et al.*, 850 F.3d 905, 911 (7th Cir. 2017).

Defendants contend that they cannot be liable as they lack sufficient personal involvement in Cortez's medical care. As to Campanella, the undersigned finds that Cortez has not established that she was deliberately indifferent to his medical needs. Cortez was seen regularly in the healthcare unit. The record reflects that Campanella was not made aware of Cortez's complaints until March 2016, when Cortez filed a written grievance concerning his medical treatment and that he spoke to Campanella about his bunk issues. On March 15, 2016, Cortez received a low-bunk permit and low housing permit.

As to Cortez's claim against George, the record reflects that she did not provide

any medical care or treatment to Cortez. Further, the record reveals that Cortez continued to receive medical treatment after he filed his grievances. Again, as noted previously, Cortez's orthopedic surgeon told Cortez in March 2018 that he did not need to have the hardware taken out of his left leg. Based on the circumstances of this case, it was reasonable for both Campanella and George to rely on the advice and treatment rendered by the medical professionals. Accordingly, no reasonable jury could find that there is evidence that these Defendants were deliberately indifferent to Cortez's medical needs. Nor could any reasonable jury find that these Defendants ignored Cortez's medical concerns.

## Conclusion

Accordingly, the Court **GRANTS** the motions for summary judgment (Docs. 69, 73). The Court DIRECTS the Clerk of the Court to enter judgment in favor of Defendants Dr. Solomon Apostol, Jeanne Campanella, Penny George and against Plaintiff Jose Cortez. Plaintiff Jose Cortez shall take nothing from this case.

**IT IS SO ORDERED**.

**DATED: February 6, 2020.**

Digitally signed by Magistrate Judge Gilbert C. Sison
Date: 2020.02.06 15:57:52 -06'00'

**GILBERT C. SISON**
**United States Magistrate Judge**